O

# United States District Court
# Central District of California

| | |
|---|---|
| GOMEZ GARCIA et al.,<br><br>             Plaintiffs,<br><br>   v.<br><br>KRISTI NOEM et al.,<br><br>             Defendants. | Case № 5:25-cv-02771-ODW (PDx)<br><br>**ORDER GRANTING *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE [4]** |

## I.   INTRODUCTION

Petitioners Gilberto Gomez Garcia, Elvia Cruz Vargas, Alejandro Tellez Mendez, and Panfilo Cirilo Noriega Enriquez move the Court *ex parte* for a temporary restraining order requiring, among other things, their release from custody or an individualized bond hearing before an immigration judge. (Ex Parte Appl. ("TRO"), Dkt. No. 4.) Respondents Kristi Noem, Secretary of the Department of Homeland Security ("DHS"), Pamela Bondi, U.S. Attorney General, Todd Lyons, Acting Director of Immigration and Customs Enforcement ("ICE"), Ernesto Santacruz, Jr., Acting Director of ICE Los Angeles Field Office, Fereti Semaia, Warden of Adelanto ICE Processing Center, Executive Office for Immigration Review ("EOIR"), ICE, and DHS oppose the request. (Opp'n, Dkt. No. 9.) For the reasons discussed below, the Court **GRANTS** the TRO.

## II. BACKGROUND

Petitioners are foreign nationals currently detained at the ICE Adelanto Processing Center and Desert View Annex in Adelanto, California. (Pet. ¶ 1, Dkt. No. 1.) Between July 3, 2025, and September 1, 2025, ICE or Border Patrol agents arrested Petitioners in Orange County and Los Angeles County. (*Id.* ¶¶ 16–19.)

Pursuant to a new ICE "Interim Guidance Regarding Detention Authority for Applications for Admission" ("New Policy"), "all noncitizens who entered the United States without inspection shall now be deemed 'applicants for admission' and subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A)." (*Id.* ¶ 38.) Prior to the New Policy, foreign nationals "present without admission" were not considered detained under 8 U.S.C. § 1225. (*Id.* ¶ 34.) Instead, they were considered detained under 8 U.S.C. § 1226(a) and received bond hearings. (*Id.* ¶¶ 34–36.) Section 1226(a) of the Immigration and Nationality Act ("INA") allows for release on bond or conditional parole, but § 1225(b)(2)(A) does not. The Immigration Judges ("IJ" or "IJs") in Petitioners' cases adopted the legal analysis set forth in the New Policy and the Board of Immigration Appeals ("BIA") decision in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025) and, having deemed Petitioners "applicant[s] for admission," the IJs denied Petitioners' requests for bond hearings. (*Id.* ¶¶ 5, 16–19.)

Based on these allegations, on October 20, 2025, Petitioners filed a Petition for Writ of Habeas Corpus on the grounds that their detention violates 8 U.S.C. § 1226(a); DHS and EOIR Bond Regulations; the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); and their Fifth Amendment Right to Due Process. (*Id.* ¶¶ 70–83.) That same day, Petitioners filed this Application for a Temporary Restraining Order and Order to Show Cause. (TRO.) Petitioners request that this Court (1) order Respondents to release Petitioners or provide them with individualized bond hearings before an IJ, (2) enjoin Respondents from relocating Petitioners outside of the Central District of California pending resolution of this case, and (3) order Respondents to show cause why a preliminary injunction should not issue. (*Id.* at 1.)

### III. LEGAL STANDARD

A temporary restraining order ("TRO") is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The standard for issuing a TRO is "substantially identical" to that for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Pursuant to Federal Rule of Civil Procedure ("Rule") 65, a court may grant preliminary injunctive relief to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). To obtain this relief, a plaintiff must establish the "*Winter*" factors: (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

The Ninth Circuit uses a sliding scale approach to preliminary injunctions, such that "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under the sliding scale approach, a plaintiff is entitled to a preliminary injunction if he has raised "serious questions going to the merits . . . and the balance of hardships tips sharply in [his] favor," "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotation marks omitted).

### IV. DISCUSSION

Respondents first argue that this Court lacks jurisdiction over this matter. (Opp'n 5–9.) In the alternative, Respondents argue Petitioners fail to meet the requirements for a TRO. (*Id.* at 9–14.) The Court first considers whether it has jurisdiction over this matter, then turns to the merits of the TRO.

### A. Jurisdiction

Respondents contend that 8 U.S.C. § 1252(b)(9) and (g) preclude review of Petitioners' claims. (Opp'n 5–9.) The Court examines each subsection in turn.

#### 1. Section 1252(b)(9)

Respondents argue that, under § 1252(b)(9), "judicial review of all questions of law . . . including interpretation and application of statutory provisions . . . arising from any action taken . . . to remove an alien from the United States" is the purview of the appropriate federal court of appeals. (Opp'n 6 (citing § 1252(b)(9)).) Although § 1252(b)(9) allocates judicial review to federal courts of appeals, this statutory provision has a much narrower scope than Respondents contend.

Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

Respondents contend that § 1252(b)(9) is an "unmistakable 'zipper' clause" that "'channels judicial review of [all claims arising from deportation proceedings]' to a court of appeals in the first instance." (Opp'n 6 (alteration in original) (citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999)). Section 1252(b)(9) calls for review of "final orders of removal" to federal courts of appeals. No final order of removal has been issued for any Petitioner in this case and Respondents do not argue otherwise. (*See generally* Opp'n.) Instead, the IJs denied Petitioners' requests for bond hearings. (Pet. ¶¶ 5, 16–19.) Absent a final order of removal, § 1252(b)(9) does not preclude this Court's review of Petitioners' TRO.

Respondents also rely on *Jennings v. Rodriguez*, 583 U.S. 281 (2018) to argue that § 1252(b)(9) bars this Court's review because Petitioners challenge the government's removal orders, "including decisions to detain for purposes of removal or for proceedings." (Opp'n 8–9.) In *Jennings*, the Supreme Court held that § 1252(b)(9) did not bar review because the plaintiff there did not "ask[] for review of an order of removal; challenge the decision to detain them in the first place or to seek removal; or challenge any part of the process by which their removability will be determined." 58 U.S. at 294–95 (citation modified). In determining the applicability of § 1252(b)(9), the Supreme Court considered if the "question[] of law"—whether statutory provisions require detention without a bond hearing—"arise[s] from" actions taken to remove the plaintiff. *Id.* at 292–93.

As discussed above, and contrary to Respondents' assertion, Petitioners here do not challenge an order of removal, the decision to detain them in the first place, or any determination of their removability. Rather, Petitioners raise a "question of law" as to whether "statutory provisions require detention without a bond hearing." *Id.* at 292–93. Specifically, Petitioners contend that their detention is governed by § 1226(a), not § 1225(b)(2), and their continued detention without a bond hearing violates § 1226(a). (*See* Pet. ¶¶ 71–72.) Accordingly, as Petitioners' claims do not "arise from" removal proceedings, § 1252(b)(9) does not bar this Court's review of Petitioners' TRO.

2. *Section 1252(g)*

Respondents next argue that § 1252(g) "deprives courts of jurisdiction, including habeas corpus jurisdiction." (Opp'n 5 (emphasis omitted).)

Section 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

1    Respondents argue that Petitioners' claims stem from their detention during
2 removal proceedings and that § 1252(g) "bars district courts from hearing challenges
3 to the *method* by which the Secretary of Homeland Security chooses to commence
4 removal proceedings, including the decision to detain an alien pending removal."
5 (Opp'n 5.) This argument requires the Court to adopt a broad interpretation of
6 § 1252(g), an interpretation that the Supreme Court has expressly rejected.

7    The Supreme Court has adopted a narrow application of § 1252(g), applying it
8 "only to three discrete actions that the Attorney General may take: her 'decision or
9 action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"
10 *Reno*, 525 U.S. at 482. This language "refer[s] to just those three specific actions
11 themselves," *Jennings*, 583 U.S. at 294 (citing *Reno*, 525 U.S. at 482–83), and is
12 "clearly designed to give some measure of protection to . . . discretionary
13 determinations, providing that if they are reviewable at all, they at least will not be
14 made the bases for separate rounds of judicial intervention outside the streamlined
15 process that Congress has designed," *Reno*, 525 U.S. at 485. Thus, "Section 1252(g)
16 was directed against a particular evil: attempts to impose judicial constraints upon
17 prosecutorial discretion." *Id.* at 485 n.9. As the Ninth Circuit has held, "the district
18 court may consider a purely legal question that does not challenge the Attorney
19 General's discretionary authority, even if the answer to that legal question—a
20 description of the relevant law—forms the backdrop against which the Attorney
21 General later will exercise discretionary authority." *U.S. v. Hovsepian*, 359 F.3d 1144,
22 1155 (9th Cir. 2004).

23    Here, Petitioners raise a question of law as to whether their mandatory detention
24 during the pendency of their removal proceedings falls under § 1226(a) or
25 § 1225(b)(2). Petitioners do not challenge the Attorney General's discretionary
26 authority to commence, adjudicate, or execute removal proceedings. Therefore,
27 § 1252(g) does not bar this Court's review of Petitioners' TRO.
28

**B.     Merits of the TRO: *Winter* Factors**

Having determined that the Court has jurisdiction over Petitioners' TRO, the Court now turns to the merits of the TRO by discussing the *Winter* factors.

*1.     Likelihood of Success on the Merits*

Petitioners contend that § 1226(a), not § 1225(b)(2), governs their detention. (TRO 6.) Respondents argue that § 1225(b)(2) governs because it applies to "applicants for admission," and Petitioners fall under this category because they are present in the United States without having been admitted. (Opp'n 9.)

a)     <u>Statutory Text</u>

First, the statutory text does not support Respondents' contention that § 1225 governs where, as here, an alien is present in the United States without admission. (*Id.* at 9.) The Court accepts Respondents' argument that "detention" under § 1225 applies to "applicants for admission," which fall into two categories as articulated in *Jennings*. (Opp'n 9–10); *see Jennings*, 583 U.S. at 287 (noting that "applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)"). Subsection (b)(1) "applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation," and subsection (b)(2) serves as a broad "catchall provision." *Id.* Petitioners here are not "applicants for admission" and thus do not fit in either category.

The text of § 1226 provides further guidance. Section 1226(a) provides:

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General
> 
> (1) may continue to detain the arrested alien; and
> 
> (2) may release the alien on
> 
>     (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
> 
>     (B) conditional parole . . . .

The disparate nature and reach of § 1225 and § 1226 is further evidenced by the lack of the phrase "applicant for admission" in § 1226. Unlike § 1225, "§ 1226 applies to aliens already present in the United States." *Jennings*, 583 U.S. at 303. As articulated by the Ninth Circuit, § 1226(a) stands out from the other immigration detention provisions. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022) ("Section 1226(a) and its implementing regulations provide extensive procedural protections that are unavailable under other detention provisions."). Section 1226(a) includes "several layers of review of the agency's initial custody determination, an initial bond hearing before a neutral decisionmaker, the opportunity to be represented by counsel and to present evidence, the right to appeal, and the right to seek a new hearing when circumstances materially change." *Id.* Further, excepting criminal aliens under subsection (c), § 1226(a)(2) permits detained aliens to be released on bond or conditional parole. Under subsection (c)(1)(E), aliens present in the United States without admission or parole *and* charged with criminal offenses are subject to mandatory detention. If Respondents are correct in their interpretation, that Congress intended for § 1225 to govern all aliens present in the United States without admission, it would render the exception carved out in § 1226(c)(1)(E) superfluous.

Second, Petitioners contend that the plain text of § 1225(b) shows that Congress did not intend to sweep into this section individuals like Petitioners, "who have already entered and are now residing in the United States." (TRO 12.) Looking to the statutory language, § 1225(b) applies to "Inspection of applicants for admission" and subsection (1) concerns "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." Section 1225(b)(2)(A) applies to "Inspection of other aliens" and provides that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained . . . ." Section 1225(b)(2)(B)–(C) also refers to various methods of entry, such as an alien arriving on land or arriving as "a crewman" or "a stowaway." Based on this language, Petitioners contend that

§ 1225(b)(2)(A) applies only to those "applicants for admission" who take an affirmative act of "seeking admission" by applying for admission or being subject to examination by an immigration officer. (TRO 12–15.)

Respondents argue that "applicants for admission" who are present in the United States without being admitted should automatically be categorized as applicants seeking admission. (Opp'n 10–11.) But Respondents fail to present persuasive legal authority on this point.

Respondents rely on the BIA's decision in *Matter of Lemus-Losa*, 25 I. & N. Dec. 734 (BIA 2012). (Opp'n 11.) In *Matter of Lemus-Losa*, the BIA determined that "many people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws." 25 I. & N. Dec. at 743. The BIA's analysis there concerned 8 U.S.C. § 1882(9)(B)(i)(II), which deems inadmissible an alien outside of the United States who "again seeks admission" following prior unlawful presence. *Id.* at 744. The BIA clarified that in some cases, such alien "will have reentered the United States unlawfully, thereby making himself an 'applicant for admission' by operation of law, while seeking 'admission' through adjustment of status." *Id.* Thus, being an "applicant for admission," alone, does not automatically mean an alien is "seeking admission." Rather, it appears, based on the BIA's example, that the further step of *applying* for adjudication of status is the act of "seeking admission" that triggers § 1225(b)(2)(A).

Respondents also rely on *Florida v. United Sates*, 660 F. Supp 3d 1239 (N.D. Fla. 2023), to argue that § 1225(b) "mandates detention of applicants for admission throughout removal proceedings." (Opp'n 11.) But *Florida* considered the issue of whether the DHS may first apprehend an alien crossing the border under § 1225(b) and later release them under § 1226(a). 600 F. Supp 3d at 1277. That is not the issue here. The *Florida* court noted that § 1226(a) applied to "certain aliens *already in the country*," while § 1225(b) "include[s] illegal border crossers." *Id.*

9

at 1275. The *Florida* court also noted that "an alien who was apprehended within the interior of the United States necessarily must have been paroled under § 1226(a) . . . because he was not apprehended at the border as a § 1225 arriving alien." *Id.* (citing *Ortega-Cervantes v. Gonzalez*, 501 F.3d 1111, 1116 (9th Cir. 2007)). As Respondents fail to articulate any valid justification for the application of § 1225 to Petitioners, the Court holds that Petitioners demonstrate that they are likely to succeed in establishing that § 1226 governs their claims, rather than § 1225.

### 2. *Likelihood of Irreparable Harm*

Petitioners contend that they will suffer irreparable harm in the absence of a TRO as they will continue to be detained without a bond hearing. (TRO 18.) Respondents do not argue that Petitioners fail to show a likelihood of irreparable harm if they continue to be detained without a bond hearing. (*See generally* Opp'n.) Here, the harm resulting from Petitioners' continued detention without due process is the deprivation of their right to a bond hearing. *See Melendez v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"). As Petitioners note, the "four Petitioners have now been detained without a bond hearing for between fifty and one hundred ten days." (TRO 18.) Continued detention without bond hearings will only perpetuate the harm. The Court finds that the potential for Petitioners' continued detention without an initial bond hearing would cause irreparable injury, as this violates their statutory rights afforded under § 1226(a). Thus, Petitioners demonstrate that continued detention without a bond hearing is likely to result in irreparable harm.

### 3. *Balance of Equities and Public Interest*

The last two *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of hardships tips strongly in Petitioners' favor as they would suffer great hardship if this Court were to deny the TRO. *See Cottrell*, 632 F.3d at 1134–35 (requiring the balance of hardships to "tip sharply" in the moving party's favor).

1    Petitioners contend that a TRO is in the public interest because they challenge
2 the New Policy for violating federal laws and Respondents cannot be harmed by being
3 required to end an unlawful practice. (TRO 19–20.) Respondents argue that they
4 have a compelling interest in allowing the BIA to speak on the issue, as the BIA
5 "exists to resolve disputes like this" and "provide clear and uniform guidance."
6 (Opp'n 13–14.) Respondents further argue that "the government has a compelling
7 interest in the steady enforcement of its immigration laws" and "[j]udicial intervention
8 would only disrupt the status quo" and "inject[] a degree of uncertainty" in the
9 immigration process. (*Id.*) Because the parties' dispute the legality of the application
10 of the New Policy, the Court is unpersuaded that granting the TRO here would disrupt
11 the status quo, especially when the New Policy hinders Petitioners' due process rights.
12 Further, as discussed above, the dispute here involves a "question of law" challenging
13 the New Policy's statutory interpretation, which the BIA has adopted. Accordingly, to
14 the extent that the BIA's adopted statutory interpretation deprives Petitioners of their
15 constitutional rights and violates federal law, "it is clear that neither equity nor the
16 public's interest are furthered by allowing violations of federal law to continue."
17 *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022). Accordingly, the last two *Winter*
18 factors weigh in favor of an injunction.

19    Having found that all *Winter* factors weigh in favor of granting the TRO, the
20 Court hereby **GRANTS** Petitioners' TRO. (Dkt. No. 4.) In light of this finding, the
21 Court declines to reach Respondents' argument that the TRO would constrain the
22 government's discretion to decide where to place immigration detainees like
23 Petitioners. (Opp'n 14–16.)

## V. CONCLUSION

For the reasons discussed above, the Court finds that all four *Winter* factors weigh in favor of a TRO. Accordingly, the Court **GRANTS** the TRO. (Dkt. No. 4.) It is hereby **ORDERED** that:

- Respondents shall release Petitioners or, in the alternative, provide each Petitioner with an individualized bond hearing before an immigration judge pursuant to 8 U.S.C. § 1226(a) **within seven (7) days** of this Order;
- Respondents are enjoined from relocating Petitioners outside of the Central District of California pending final resolution of this case; and
- Respondents shall **SHOW CAUSE**, in writing only, to be received by the Court no later than **October 27, 2025**, as to why the Court should not issue a preliminary injunction in this case. Petitioners may file a reply by **October 29, 2025**. The Court **SETS** a hearing on the preliminary injunction on **November 3, 2025, at 10:00 a.m.**, via Zoom.

**IT IS SO ORDERED.**

October 22, 2025

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**